January Term,
1862.

FELCH
v.
LEE et al.

---

FELCH vs. LEE and another.

In equity cases this court reviews the evidence without any motion for a new trial
having been made in the court below.

A judgment against principal and *surety* was transferred to a third person, who
paid for it with money borrowed on the note of the *principal*. *Held*, that the
judgment must be regarded as paid, and equity will restrain its collection from
the surety.

APPEAL from the Circuit Court for *Kenosha* County.

This was an action by *Felch* to restrain the sale of his land
under an execution issued upon a judgment recovered by
one Chaffee against *Felch* and the defendant *Richard Lee*, of

which the other defendant, *Thomas Lee*, claimed to be the owner by assignment. The pleadings in the case showed that in June, 1857, *Richard Lee* bought of *Felch* a piece of land, and took his bond for a deed of it on the payment of $1700 in four equal annual instalments : that as security for the first instalment of $425, said *Richard* gave *Felch* a judgment note, due November 1, 1857 ; that when that note fell due, *Richard* was unable to pay it, and borrowed the money from said Chaffee for that purpose, giving his note for the amount, which *Felch* signed as his surety ; that after the note fell due, Chaffee obtained judgment upon it against the makers ; and that Chaffee, in February, 1860, executed an assignment of the judgment to the defendant *Thomas Lee*, who had caused execution on it to be levied on the land of *Felch*. It appeared also that in November, 1858, *Richard Lee* gave up again to *Felch* the land purchased of the latter. It was alleged by the defendants that said *Richard* had made improvements on the land to the value of $200, and that when *Felch* took it back, he agreed to pay the note held by Chaffee. This *Felch* denied. It was alleged by *Felch* that the money which was used to obtain the transfer of Chaffee's judgment, was borrowed of one Campbell upon the note and mortgage of said *Richard Lee*, and that the judgment was actually paid therewith, but was assigned to *Thomas Lee* for the purpose of defrauding *Felch* by collecting it from his property. This the defendants denied.

The cause was tried in November, 1860. The evidence as to the alleged agreement of *Felch* to pay the note given to Chaffee, was as follows : *Richard Lee* testified : " I suppose I made improvements upon the land worth $200, and had the land 16 or 18 months. There was an agreement between the plaintiff and me about my giving up the land. He agreed that he would clear me of the Chaffee note, and see me all right and straight, if I would give it up. I don't know what the note was made for to Chaffee ; I don't know as there was any agreement about it.  *  *  It was the same note I gave to *Felch*, that he said he would see me harmless about. At this time I was sad. About this time he called me up to Jilsun's office. Jilsun handed me a summons ; I did not know

at the time that it was a summons. *Felch* told me to go home —that I need not be there; that is my remembrance about it. * * The agreement about giving up this land was about two years ago. I was at home when it was made. *Felch* said if I would give up the land, he would see me all straight; he gave me two or three days to consider upon it; we talked about the Chaffee note then. I don't know who was to pay the Chaffee note, because I never had anything for it. I suppose I was to pay it; I don't know as I could tell what part. When I told him I would give it up, I went to town; saw him on my way there; I think we talked about it; after this he went into possession of the land. * * I don't know when it was that I agreed to give up the land— think at his, *Felch's*, house. I had but these two conversations with *Felch* about it. I had a conversation with him about paying the Chaffee note after this. I offered to turn out my horses to pay the Chaffee note. I don't owe the note to Chaffee. I don't know anything about the Chaffee note. I know this, it was after the land was taken back."

*William Lee*, as a witness for the defendants, said: "I am eighteen years old; have known *Felch* twelve or thirteen years. I saw *Felch* at father's house; I happened to come up just as he was going away; heard *Felch* say, 'If you will give the land back, I will see no trouble ever comes of it."

Betsy Lee, as a witnesss for the defendants, said: "I am the daughter of *Richard Lee*. I know *Felch*; saw him at father's house. *Felch* said if father would give up the land, he would see the note of Chaffee straightened up." On cross-examination the witness said: "I don't recollect the whole conversation; *Felch* came there to see if father would give the land back or pay him something. I don't know as he said how much was due him. *Felch* said he would give him two or three days to consider. *Felch* was there about an hour; I was not in the house all the time; don't remember as either of them said Chaffee wanted his note; heard nothing of this sort; I don't recollect anything more of the conversation; I was in the room when they were in the house, and father was in the house when *Felch* was there. Don't recollect that I was talking about anything else. About two

weeks ago yesterday I was first asked what I knew about it. I had thought about it before. I remembered *Felch* wanted father to pay him some money; no papers were shown by *Felch* there; *Felch* said he would take stock to pay his interest; don't know how much he said he would take. I have heard this matter talked over in the family several times, but I never told them what I knew about it till two weeks ago."

The plaintiff, as a witness in his own behalf, testified: "After the second payment became due, I called on *Richard Lee* and told him he must pay the interest or secure the amount due; that he must do one or the other, and that he might take time to consider, and consult with his family; and then I left him; I have no recollection of the Chaffee note having been mentioned in the conversation with him that day. It might have been spoken of, possibly, but nothing was said about my paying the Chaffee note. At a subsequent time I saw him, and he called to me, and said he had concluded to give up the land; but at no time did I ever agree to pay or hold him harmless from the Chaffee note. The first I ever knew of his wanting me to pay it, was in the spring of 1859; he then called upon me several times and said I ought to pay it. I told him I would leave it to anybody to say whether I was under any obligation to pay it, and asked him to pick his man. He said he would leave it to T. G. Kellogg, and I agreed to leave it to Kellogg. We met at Kellogg's house; I proposed that he should state the facts to Kellogg; he said, 'No, you state them.' I then stated the facts, the substance of which I have stated here. He agreed to my statement, and Kellogg gave his opinion. Neither at that time nor in any other conversation did he ever claim that I had agreed to pay the Chaffee note. In December, [1858], or January, 1859, I took possession of the land. The twenty acres that he plowed upon it in the fall of 1858, was the principal improvement he had made upon it, to me. I offered this land for sale, after I took it back, for the amount then due from *Lee.* There was $1300 and interest due upon it when I took it back."

T. G. Kellogg, as a witness for the plaintiff, said: "I was

called upon to settle a difference between these parties. *

*Felch* asked *Lee* to make a statement of the case. *Lee* said, ' *Felch*, you make it.' *Felch* said he would if *Lee* would correct him in case he stated anything wrong. *Felch* said he had sold 80 acres of land to *Lee* and had received the first payment—a certain judgment note payable at the City Bank of Racine ; that when the paper became due, the money was borrowed of Chaffee to pay it, and he signed as surety the note given to Chaffee for the money ; and that he had since taken back the land because *Lee* could not pay for it. The question stated to me was, whether *Felch* should pay the Chaffee note. Before this, however, I asked *Lee* if he had anything to say ; if *Felch* had stated the matter as it was. *Lee* said he had, and that he had nothing to say. He said nothing about *Felch* having ever agreed to pay the Chaffee note. ˉI decided that *Felch* was not holden to pay it. There was something said about the land having fallen in value. *Felch* then offered to give a deed and take a note and mortgage back. The parties then went away." .

The proof as to the ownership of the Chaffee judgment, is stated in the opinion of the court. The circuit court found that *Felch* had agreed with *Richard Lee* to pay the Chaffee note, and that *Thomas Lee* was the owner of the judgment on that note, and rendered judgment against the plaintiff for costs.

*Jilsun & Lovell,* for appellant.

*O. S. & F. H. Head,* for respondents.

*By the Court,* COLE, J. We have frequently decided that May 15. in equity cases, the finding of facts by the court below was not conclusive, but that we would look into the testimony and determine what facts were established by it. This must be so, since the constitution gives this court appellate jurisdiction of cases at law and equity, and by the well established rules of practice, the appellate court reviews the evidence in equity causes in the same manner as the court of original jurisdiction. In common law cases the rule is otherwise. And therefore the position of the counsel for the respondent is not correct, that we must assume that the facts

January Term,
1862.

FELCH
v.
LEE et al.

in this action are as stated by the circuit court, and that we can only look into the cause for the purpose of determining whether the conclusions of law were warranted by the facts found. This we do not understand to be the law controlling this court in equity causes.

Nor do we deem it necessary that there should be, in such a case, a motion for a new trial, in order to give this court a right to review the evidence. The cases cited by the counsel to this point were actions at law, and are therefore inapplicable to the one at bar. It is our duty then to go behind the finding of the circuit court, and determine for ourselves what facts are satisfactorily established by the testimony in the cause. And we are unable to agree with the circuit court in the conclusion, that the evidence shows that after the giving of the Chaffee note which is mentioned in the case, an agreement was made between the appellant and *Richard Lee*, by the terms of which the latter was to surrender up to the former the real estate which he had purchased and held a contract for, with what improvements he had made thereon, and that in consideration thereof the appellant agreed to pay the note which he and *Richard Lee* had given Chaffee. It is true there is some testimony in the case tending to show that some such agreement was made, but to our minds it is very slight and unsatisfactory. The respondent *Richard Lee* says, in a very confused and halting way, that such an agreement was made. His son William and daughter Betsy testify to hearing some conversations between their father and the appellant, in which *Felch* proposed or said to *Lee*, if he would give the land back, he, *Felch*, would see the Chaffee note straightened up or paid. But it must be admitted that even this testimony in regard to conversations and admissions made by the parties, is exceedingly indefinite and unreliable. It is certainly subject to more than the usual degree of imperfection and weakness belonging to that kind of testimony, because the witnesses do not pretend to have heard or understood all the conversation between the parties. We therefore think it is entitled to but little weight under the circumstances.

On the other hand, the appellant swears most positively

January Term, 1862.

FELCH
v.
LEE et al.

and distinctly that no such agreement was ever made. And upon this point we think his testimony is entitled to very great credit, because it is so fully sustained and corroborated by what Kellogg says occurred before him. Kellogg was a disinterested party, mutually agreed upon to settle the differences between the appellant and *Richard Lee*, growing out of this land purchase and surrender. *Lee* had been claiming, after the surrender of the real estate, that *Felch* should pay this Chaffee note. *Felch* denied that he was under any obligation to pay it, and proposed to submit the matter to any one whom *Lee* might name, to say whether, under the circumstances, he ought to pay that note. The parties met before Kellogg and stated the facts in respect to the purchase and sale of the real estate; the payments which were made; the giving of the Chaffee note; the abandonment by *Lee* of the contract; the agreement by *Felch* to take back the land, and release *Lee* from further liability on the contract. But in this statement nothing was said about the alleged agreement of *Felch* to pay the Chaffee note in consideration of *Richard Lee* surrendering up the real estate which he had bought of him. Is it not probable that this fact would have been stated to Kellogg by one or the other of the parties, if it really had been part of that agreement? More, is it not impossible to believe that so material and essential a part of that agreement as the payment of the Chaffee note, should have been overlooked or omitted by *Lee*, if *Felch* had agreed to pay it? Yet it was not claimed or even mentioned by either party before Kellogg, that it had ever been agreed that *Felch* was to pay the Chaffee note, and save *Lee* harmless therefrom. We are therefore forced to the conclusion that no such agreement was ever made.

It is a conceded fact in the case that *Felch* signed the Chaffee note merely in the character of surety. He was not, then, primarily bound to pay it as between him and *Richard Lee*. The latter was the principal debtor. It appears that Chaffee afterwards obtained judgment on the note and was proceeding to enforce collection of the judgment by execution. Some three hundred dollars worth of personal property belonging to *Lee* was seized in execution and advertised for

January Term, 1862.

sale .But before sale, a loan of money was effected of Campbell, sufficient to discharge the judgment. The judgment however was not discharged of record, but it was assigned to the respondent *Thomas Lee,* who claims to be the real owner of it, and who is endeavoring to enforce its collection as against the appellant. This, perhaps, he might lawfully do were he the real owner of that judgment. But we are satisfied that he is not. It is true he loaned the money from Campbell. But *Richard Lee* gave his note and a mortgage upon his own property to secure the repayment of this money. And we think the evidence shows that *Thomas* acted merely as the agent of *Richard* in obtaining this loan from Campbell. We are authorized to assume that *Richard* was the real party who got the money of Campbell, and paid a judgment which in law he was bound to pay. Of course such payment discharged the judgment, and its collection ought not to be enforced for his benefit against his surety. This is clear upon the most obvious principles of law and justice.

It follows from this that the appellant was entitled to an injunction restraining the collection of the judgment mentioned in his complaint.

The judgment of the circuit court must therefore be reversed, and the cause remanded to the circuit court with directions to grant the appellant the relief asked for in his complaint.